AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Collection of DNA by Means of Buccal Swab from<br>Caleb Jessie Chapman | ) ) ) ) ) )   Case No. 3:21-mj-05188 |

```
                FILED _____ LODGED
                _____ RECEIVED
                09/07/2021
                CLERK U.S. DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON AT TACOMA
                BY_____DEPUTY
```

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Caleb Jessie Champan, as further described in Attachment A, incorporated herein by reference

located in the ____Western____ District of ____Washington____, there is now concealed *(identify the person or describe the property to be seized)*:

Deoxyribonucleic Acid (DNA) obtained by a buccal swab from Caleb Jessie Chapman as further described in Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922 (g) (3) | Unlawful user of or addicted to any controlled substance in possession of firearm |
| 18 USC 1862 | Injury or destruction of radio communication system operated by the United States |
| 18 USC 641 | Possession of stolen property owned by the United States or any agency thereof |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Brett J. Hockenbury, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ *(specify reliable electronic means)*.

Date: 09/07/2021

*Judge's signature*

City and state: Tacoma, WA

Theresa L. Fricke, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Brett J. Hockenbury, a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), having been duly sworn, state as follows:

## PERSON TO BE SEARCHED

1. This affidavit is made in support of an Application for Search Warrant to obtain buccal swabs for DNA analysis from the following person: CALEB JESSIE CHAPMAN (hereinafter, CHAPMAN), who is approximately 5'08'' tall, weighs approximately 175 pounds, has brown hair and blue eyes. His Washington Driver's License number is WDL6P169453B.

## TRAINING AND EXPERIENCE

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since January of 2021. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I am assigned to the Seattle Division of the FBI and currently work from the FBI office in Tacoma, Washington. Prior to becoming a SA, I was employed as a United States Navy Hospital Corpsman where I routinely administered patient care to include Deoxyribonucleic Acid (DNA) collection. As a Special Agent, I have participated in investigations involving, but not limited to, drug trafficking, sexual assault, and felon in possession. I have gained experience through training at the FBI Academy and everyday work relating to conducting these types of investigations.

4. I obtained the following information through personal knowledge based on my participation in this investigation, through information provided to me by other law enforcement officers, and through discussions with other agents and officers who are familiar with this investigation. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation.

5. The facts set forth in this Affidavit occurred within the City of Port Angeles, Washington, Clallam County, and Olympic National Park. Olympic National Park is an area of federal public land administered by the National Park Service. Olympic National Park is an area of special maritime and territorial jurisdiction of the United States. Olympic National Park is located within the Western District of Washington.

//

## PERSONS AND CRIMINAL OFFENSES

6. This affidavit is submitted in support of an application to obtain DNA samples from CHAPMAN. There is probable cause to believe that these samples will corroborate the belief of investigators that CHAPMAN did violate the following laws of the United States:

   a) *Title 18 U.S. Code 922 (g) (3): It shall be unlawful for any person to possess a firearm or ammunition who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802).*

   b) *Title 21 U.S. Code § 844(a): It shall be unlawful for any person knowingly or intentionally to possess a controlled substance.*

   c) *Title 18 U.S. Code § 1362: Whoever willfully or maliciously injures or destroys any of the works, property, or material of any radio, telegraph, telephone or cable, line, station, or system, or other means of communication, operated or controlled by the United States, or used or intended to be used for military or civil defense functions of the United States, whether constructed or in process of construction, or willfully or maliciously interferes in any way with the working or use of any such line, or system, or willfully or maliciously obstructs, hinders, or delays the transmission of any communication over any such line, or system, or attempts or conspires to do such an act.*

   d) *Title 18 U.S. Code § 32 (a) (8): Attempts or conspires to do anything prohibited under paragraphs (1) through (7) of this subsection (incorporating 18 U.S. Code § 32 (a): whoever willfully sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce).*

   e) *Title 18 U.S. Code § 1855: Whoever, willfully and without authority, sets on fire any timber, underbrush, or grass or other inflammable material upon the public domain or upon any lands owned or leased by or under the partial, concurrent, or exclusive jurisdiction of the United States,*

   f) *Title 18 U.S. Code § 1853: Whoever unlawfully cuts, or wantonly injures or destroys any tree growing, standing, or being upon any land of the United States which, in pursuance of law, has been reserved or purchased by the United States for any public use.*

   g) *Title 18 U.S. Code § 113 (a) (4): Whoever, within the special maritime and territorial jurisdiction of the United States assaults by striking, beating, or wounding.*

   h) *Title 18 U.S. Code § 2261 (a) (1): A person who travels in interstate or foreign commerce or enters or leaves Indian country or is present within the special maritime and territorial*

> jurisdiction of the United States with the intent to kill, injure, harass, or intimidate a spouse, intimate partner, or dating partner, and who, in the course of or as a result of such travel or presence, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner.
>
> i) Title 18 U.S. Code § 641: Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof.

### FACTS IN SUPPORT OF PROBABLE CAUSE

7. At about 2:00 AM on August 29, 2021, CHAPMAN contacted R.H. at R.H.'s home and gave R.H. a handwritten note that discussed his grievances with the White House, his difficulty with obtaining ammunition, and referenced a pending "revolution" starting on the Olympic Peninsula and in Texas. At that time CHAPMAN was armed with AR-15 rifle and a handgun that was concealed in his waistband.

8. At about 4:30 AM, the Peninsula Emergency Communications Center (PENCOM) received a 911 telephone call reporting a wildfire burning in Olympic National Park, about one mile south of the intersection of the Hurricane Ridge Parkway and Mt Angeles Road. The Clallam County Fire Department and US Park Ranger Dan Hall responded to this wildfire and extinguished it. A Washington Department of Natural Resources wildland fire investigator responded to this fire and conducted the fire origin and cause investigation. Based upon Schmeltz's preliminary fire origin and cause investigation, any natural or accidental causes of this fire where excluded. He believed the fire was human caused and intentionally set.

9. Later that morning, PENCOM received a report from a National Park Service (NPS) employee that a tree had been cut down and was blocking Deer Park Road within the boundaries of Olympic National Park. Deer Park Road leads to Deer Park Campground and ends just below the summit of Blue Mountain. Park Rangers located one Douglas Fir tree that had been felled, but had been moved to the road shoulder by an NPS Contractor, and a second Douglas Fir tree that had been cut as if it was intended to be felled but was still was standing.

10. At about 10:09 AM, Ranger Grego located a white Ford F-250 extended cab pick-up truck parked at the end of the Deer Park Road. This truck was displaying Washington license plate C99383B and was registered to Ryan Adams.

11. Ranger Grego contacted the adult female in the truck who was later identified as A.J. A.J. told Ranger Grego that she was CHAPMAN's girlfriend, and that CHAPMAN was armed with multiple firearms somewhere near them on Blue Mountain.

12. Rangers evacuated the Deer Park campground, trailheads, and road areas. For the next few hours, NPS Rangers, Port Angeles Police Officers, Clallam County Sheriff's Deputies and Federal Bureau of Investigations (FBI) Special Agents (SA) attempted to locate CHAPMAN using exigent cellular telephone location data (pings), and a police dog.

13. On August 29, 2021, A.J. was interviewed by law enforcement. A.J. said that CHAPMAN used methamphetamine and began acting erratically sometime after midnight on August 29, 2021. At approximately 2:00 a.m., after dropping his kids off with his brother, CHAPMAN and A.J. went to R.H.'s house to deliver a note CHAPMAN had written to R.H.

14. After speaking with R.H. and delivering his note to at least one other personal acquaintance, CHAPMAN and A.J. drove to the Deer Park campground in the Olympic National Park. On their way to the campground CHAPMAN stopped the truck and walked into the woods. Shortly thereafter A.J. saw embers from a fire near CHAPMAN's location. Upon his return to the truck, CHAPMAN smelled of gasoline.[1]

15. While traveling up Deer Park Road towards the campground, A.J. indicated CHAPMAN stopped the truck multiple times. A.J. observed CHAPMAN exit the truck and she heard a chainsaw being operated. It was dark and she was unsure of what he was doing. This activity described by A.J. is consistent with the location of the felled tree observed by NPS employees.

16. At approximately 6:00 a.m. on August 29, A.J. and CHAPMAN arrived at the Deer Park Campground area. According to A.J., CHAPMAN became increasingly upset. CHAPMAN told A.J. that she was going to die because of the "revolution." CHAPMAN made suicidal comments about himself, including telling A.J. that he was never going to see his children again and that this was his "last day". A.J. stated that she was able to surreptitiously dial 911 from a cell phone during this time. CHAPMAN became aware of this, and grew enraged, telling A.J. that she didn't know what she had just done.

17. While arguing with A.J., CHAPMAN threw a full and unopened soup can at A.J., hitting her and causing a laceration to her leg. During the investigation, Ranger Grego observed a laceration on A.J.'s leg. A.J. reported that CHAPMAN then grabbed her by the head and hit her head, repeatedly, against the car seat while telling A.J. to "shut up." A.J. then observed CHAPMAN leave the truck and

---

[1] While A.J. described the fire as being on the Deer Park Road, the fire is within the first mile on the Hurricane Ridge Parkway. It is believed A.J. incorrectly reported the name of the road where the wildfire occurred as Deer Park Road instead of Hurricane Ridge Parkway.

walk into the woods while yelling and screaming. A.J. stated that when CHAPMAN left he was wearing a black colored tactical vest, a sleeveless shirt, jeans, and was armed with a semi-automatic rifle, a shotgun, and multiple handguns.

18. A.J. told agents that CHAPMAN had been talking about a "revolution" and he believes that there is going to be an armed conflict with the government. A.J. told investigators that she did not believe that CHAPMAN would harm the public but believed he will act violently towards law enforcement if he feels threatened. A.J. also believed that CHAPMAN has additional methamphetamine in his possession.

19. At about 3:00 PM, the Olympic National Park radio communications site (radio repeater) located at summit of Blue Mountain suddenly stopped functioning. This radio repeater is owned by the National Park Service. It is used by Olympic National Park for emergency response, public safety and administrative radio communications.

20. On August 31, 2021, at approximately, 9:00 PM, CHAPMAN was located by an Unmanned Aircraft System (UAS) commonly referred to as a "Drone." CHAPMAN was inside the Ford F-250 pick-up truck that was still parked at the Blue Mountain Summit parking lot. The UAS was remotely operated by law enforcement and was being used to perform a reconnaissance of the area. CHAPMAN fired at the UAS with a shotgun. The firearm used was a modified Remington, Model 870, pump-action shotgun with an overall length of less than 26 inches as the stock had been removed.

21. Law enforcement officers were ultimately able to contact CHAPMAN on his cell phone and were eventually able to negotiate his surrender. At about 9:51 PM, CHAPMAN surrendered to FBI Agents and was placed under arrest. The Remington 870 shotgun that CHAPMAN used to shoot at the drone was also seized as evidence.

22. After CHAPMAN was arrested, NPS and FBI officers seized as evidence four semi-automatic pistols, two semi-automatic rifles and one 20-gauge pump action shotgun from areas adjacent to CHAPMAN's arrest. These firearms were transferred to the Clallam County Sheriff's Office for evidence storage.

23. On September 1, 2021, NPS Special Agents searched the area around the Blue Mountain parking lot, which had been closed since the law enforcement incident began on August 29, 2021. An NPS Information Technology (IT) Specialist accompanied them.

24. The white Ford F-250 used by CHAPMAN was still parked in the parking lot. On the ground directly next to the driver's door, an Agent found one expended Federal brand 12-gauge shotgun shell and one unexpended Federal 12-gauge shotgun shell. Law enforcement officers observed two Stihl chainsaws and multiple boxes of ammunition in plain view in the white Ford F-250.

25. Agents then searched the Blue Mountain radio repeater site with the assistance of the NPS IT Specialist, who is a subject matter expert regarding NPS radio repeaters. They determined that two lower screws on the fiberglass door of the repeater had been pried up from the door frame and the metal hasp on the door and door frame was missing its padlock. An agent collected three DNA swabs, one from each door screw and one from the hasp.

26. When the IT Specialist examined the radio repeater electronical components, he noted that radio repeater power cable and the transmitting antenna cable had been removed from the radio repeater. An agent took DNA swabs from the power cable and transmitting antenna cable connectors that would have to have been touched to remove them from the radio repeater. The plastic ring on the power cable that screws into the radio repeater was broken and needed to be replaced in order to return the radio repeater into service.

27. NPS Agents searched the general area around the summit of Blue Mountain parking lot and found two caches of CHAPMAN's items that had been left on the Blue Mountain "rainshadow trail." At these locations, agents found several hundred live ammunition cartridges in various calibers and quantities, a loaded Smith & Wesson MP 9mm semi-automatic pistol, radio repeater electrical components, an Olympic National Park radio frequency list, a radio microphone, food and water, knives, general survival equipment, a brown leather journal with CHAPMAN's photograph on it, personal items and identification cards belonging to CHAPMAN, A.J., and other individuals, along with a baggie containing a white crystalline substance believed to be narcotics.

28. On the afternoon of September 2, NPS US Park Ranger Bolin measured the overall length of the Remington 870 shotgun that CHAPMAN used to fire at the drone. The overall length was determined to be less than 26 inches.

29. When performing records checks of the Smith & Wesson MP .40 caliber semi-automatic pistol, serial number HVN7197, that was seized in the area surrounding CHAPMAN at the time of his arrest, Port Angeles Police Sergeant Josh Powless determined this pistol was reported as stolen to the Port Angeles Police Department in 2017.

### BACKGROUND ON DNA TESTING

30. Based on my training and experience, I know that each human has his or her own Deoxyribonucleic Acid (DNA) markers, and that, since the inception of the use of DNA in forensic science, DNA analysis has been widely used. Humans may leave traces of their DNA in various forms, including, but not limited to semen, sweat, and blood. In addition, based on my training and experience, I know that crime laboratories can identify the source of DNA obtained from a crime scene by the comparison of that DNA to the DNA of persons from whom it may have originated.

31.     Based on the aforementioned facts, I respectfully request that the Court issue a federal search warrant authorizing agents to obtain forensic/DNA evidence from CHAPMAN. This evidence, which will be collected from CHAPMAN inside the cheek/gum area utilizing swabs, will be used for comparison to any DNA recovered from DNA swabs collected at the Blue Mountain radio repeater site, from recovered property owned by the United States, and from recovered firearms.

32.     Based on my training and experience, I know that DNA is typically collected from a person by rubbing one or more long cotton swabs against the inner cheek. The swabs are then preserved by being placed in a sterile container and sealed. If this search warrant application is approved, I will follow these protocols by swabbing the inner cheek of CHAPMAN with one or more long cotton swabs, provided to me in sterile form. I will then place the cotton swabs in a sterile container and seal the container. I will then place the sterile container containing the swabs into another container that will be sealed and sent to the Washington State Patrol Laboratory (or other agency), along with the swabs collected and preserved from the evidence in this case.

## CONCLUSION

33.     Based on the above facts, I believe there is probable cause for the issuance of a search warrant for the buccal swabs of the person of CALEB JESSIE CHAPMAN. If this search warrant is signed, the seizure of CHAPMAN pursuant to this search warrant will be limited to the swabbing of his inner cheek. I believe that the DNA analysis will provide evidence that is material to this ongoing investigation into CHAPMAN's violations of Title 18, United States Code, Sections 922(g)(3), 1362, 32(a)(8), 1855, 1853, 2261(a)(1), 113(a)(4), and 641.

34.     This warrant is being submitted via reliable electronic means under Fed. R. Crim. P. 4.1 & 41(d)(3).

_____
Brett J. Hockenbury, Affiant
Special Agent
Federal Bureau of Investigations

The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone on this 7th day of September, 2021.

_____
Theresa L. Fricke
United States Magistrate Judge

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT/ U.S v.        7
CHAPMAN MJ21-05185

## ATTACHMENT A - PERSON TO BE SEARCHED

**Caleb Jessie Chapman**, a white male, date of birth October 3, 1979, Washington Index number 20846264, FBI number 481085WB3, approximately 5'09" and 160 pounds, with brown hair and blue eyes.



Attachment A

# ATTACHMENT B

# ITEMS TO BE SEIZED

Three buccal oral-swabbing samples taken from **Caleb Jessie Chapman**, described in Attachment A, by placing a swab inside his mouth and against the inside of his cheek, thereby extracting saliva and cellular matter.